WINDELS MARX LANE & MITTENDORF, LLP
*Successor Attorneys for Roy Babitt, Chapter 7 Trustee*
156 West 56th Street
New York, New York 10019
(212) 237-1000
Attorneys appearing:  Alan Nisselson (anisselson@windelsmarx.com)
        Howard L. Simon (hsimon@windelsmarx.com)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br> MORGAN & FINNEGAN, L.L.P.,<br><br>    Debtor. | <u>Chapter 7</u><br><br> Case No. 09-11203 (RDD) |
| ROY BABITT, Trustee for the Chapter 7<br>Estate of MORGAN & FINNEGAN, L.L.P.,<br><br>    Plaintiff,<br><br>   -against-<br><br>LOCKE LORD BISSEL & LIDELL LLP, SETH ATLAS,  WILLIAM S. FEILER, PETER N. FILL, ROBERT GOETHALS, JAMES GOULD, HARRY C. MARCUS, STEVEN F. MEYER, JOHN W. OSBORNE, RICHARD STRAUSSMAN, JOHN F. SWEENEY, DR. ANDREA WAYDA and JOSEPH A. DEGIROLAMO,<br><br>    Defendants. | Adv. Pro. No. 11-____(RDD)<br><br>**REDACTED COMPLAINT**<br>***Pursuant to Stipulation and Order for the Production and Exchange of Confidential Documents and Material so ordered by the Court on February 10, 2011 (Doc. No. 90)*** |

**COMPLAINT FOR (1) AN ACCOUNTING, (2) TURNOVER OF PROPERTY OF THE ESTATE, (3) UNJUST ENRICHMENT AND RELATED COUNTS, (4) CONSTRUCTIVE TRUST, (5) SUCCESSOR LIABILITY/*DE FACTO* MERGER, (6) AVOIDANCE OF PREFERENTIAL OR FRAUDULENT TRANSFERS, (7) BREACH OF FIDUCIARY DUTY AND RELATED COUNTS AND (8) EQUITABLE DISALLOWANCE AND SUBORDINATION**

Plaintiff Roy Babitt, as Trustee for the Chapter 7 estate ("Estate") of Debtor Morgan &

Finnegan, L.L.P. ("M&F" or "Debtor"), by and through his undersigned counsel, alleges as

follows:

## Overview, Nature of the Action

1.      Plaintiff brings this complaint against a number of defendants with past ties to M&F, an intellectual property law firm that dissolved on January 31, 2009 and filed for bankruptcy on March 17, 2009. Defendant Locke Lord Bissell & Liddell LLP ("Locke Lord") is the successor firm to M&F. The remaining defendants are the equity partners who were at M&F in the end and voted to dissolve the firm. Defendants Seth Atlas, William S. Feiler, Peter N. Fill, Robert Goethals, James Gould, Harry C. Marcus, Steven F. Meyer, John W. Osborne, Richard Straussman, John F. Sweeney and Dr. Andrea Wayda (together, the "Withdrawing Partners") all received offers from and joined Locke Lord. Defendant Joseph A. DeGirolamo either did not receive or did not accept an offer from Locke Lord and went to another firm.

2.      The action arises out of the events leading up to and including M&F's dissolution and bankruptcy filing. M&F's financial troubles began in 2007 when seven partners left the firm, and the situation deteriorated even further in 2008 when four more partners defected. The firm's income dropped precipitously in the first half of 2008 and it made no money in the second half of the year. M&F was insolvent by July 1, 2008, if not earlier, and it began exploring a merger with another firm and also retained outside counsel for advice on a dissolution plan or bankruptcy. The Withdrawing Partners and Mr. DeGirolamo, as equity partners in a firm that was insolvent or approaching insolvency, had a clear fiduciary duty to the creditors of M&F.

3.      Locke Lord soon became the only serious candidate for a merger with M&F. The two firms had extensive discussions and exchanged a document outlining the terms of a full-fledged merger transaction; but then Locke Lord tried to restructure the deal to steer clear of a

formal merger because, upon information and belief, it wanted to avoid liability for M&F's debts and obligations. Locke Lord still wound up making offers to all but one of the remaining M&F partners. The Withdrawing Partners, including all the members of M&F's Executive Committee, and the two contract partners who were left all accepted. Locke Lord also hired many of M&F's other attorneys and staff and took over M&F's offices in New York City and San Francisco.

4.     Before the Withdrawing Partners joined Locke Lord they made two decisions at Locke Lord's direction or urging that benefited themselves and Locke Lord but harmed M&F. One, they delayed the bankruptcy filing and agreed to manufacture a default to terminate the New York office lease. This paved the way for the landlord to draw down on a $4.9 million letter of credit (the "LOC') issued by JPMorgan Chase Bank, N.A. ("JPMorgan") and saddled M&F with an enormous debt obligation, all so that Locke Lord could negotiate a better lease with the landlord to stay in the same space. (JPMorgan subsequently purported to transfer its bankruptcy claim related to the drawdown to Locke Lord.) Two, at the eleventh hour the Withdrawing Partners included a provision in the dissolution plan that purported to waive M&F's rights to the net profits on cases they took with them to Locke Lord. They did what was best for themselves and Locke Lord, not what was best for M&F or its creditors.

5.     Locke Lord did not call its takeover of M&F a merger, but the result was a *de facto* merger. M&F's New York and San Francisco offices became Locke Lord's New York and San Francisco offices. Locke Lord retained all the remaining M&F partners save one, including all the members of the Executive Committee. With few exceptions, M&F's clients became Locke Lord's clients. The partners and the many other attorneys and staff who were hired by Locke Lord stayed in their same offices or work stations. Locke Lord kept and used

much of the same furniture, artwork and office equipment. The name on the door changed and Locke Lord added some of its own people, but there was substantial continuity of M&F's operation.

6.     Plaintiff seeks a judgment declaring that Locke Lord is the successor to M&F, was unjustly enriched and must account for and turn over the net profits from all cases inherited from M&F (the "Unfinished Business"). Plaintiff seeks damages from Locke Lord for its role in helping the Withdrawing Partners breach their fiduciary duty to M&F and its creditors, and in conspiring with them to harm the Estate for the benefit of the successor firm.   Plaintiff also requests an order disallowing or equitably subordinating the bankruptcy claim that JPMorgan transferred to Locke Lord.

7.     Plaintiff asserts a claim against the Withdrawing Partners for their breach of fiduciary duty and other conduct to the detriment of M&F's creditors, and likewise seeks an accounting and recovery from them of the net profits from the Unfinished Business.

8.     Lastly, Plaintiff seeks to avoid as preferences or fraudulent conveyances certain payments, transfers of interests of the Debtor in property and/or obligations incurred by the Debtor.

### Jurisdiction; Venue; Statutory Basis

9.     The Court has jurisdiction over this complaint under 28 U.S.C. §§157 and 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.).

10.     Venue in this Court is proper under 28 U.S.C. §§1408 and 1409 because this adversary proceeding arises out of a case pending in this District.

11.     The statutory predicates for the relief requested in this Complaint are 11 U.S.C.

§§101, *et seq.* (the "Bankruptcy Code"), specifically §§502(d), 510, 542, 544(b), 547(b), 548, 550(a) and 551; Rule 7001 of the Federal Rules of Bankruptcy Procedure; NYPL §§40, 43-44; and NYDCL §§271-79. This is a core proceeding under 28 U.S.C. §157(b)(2)(A), (F), (H), (K) and (O).

### Bankruptcy Filing

12.     M&F filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on March 17, 2009 (the "Petition Date"). The Estate was created as of the Petition Date consisting of all property identified in Bankruptcy Code Section 541.

13.     Plaintiff Roy Babitt was appointed interim trustee by the United States Trustee (the "UST") pursuant to Bankruptcy Code Sections 701(a) and (c), and he has since qualified and is serving as permanent trustee pursuant to Bankruptcy Code Section 702 (d).

14.     Windels Marx Lane & Mittendorf, LLP succeeded Arent Fox, LLP as counsel to the Trustee effective August 19, 2010.

15.     No official committee of unsecured creditors has been formed.

16.     Creditors have filed more than 100 claims in this bankruptcy. The claims add up to more than $10 million.

### Parties

17.     Locke Lord describes itself on its website as a "full-service, national law firm with offices in Atlanta, Austin, Chicago, Dallas, Hong Kong, Houston, London, Los Angeles, New Orleans, New York, Sacramento, San Francisco and Washington, D.C." Its New York and San Francisco offices were acquired from M&F.

18.     The Withdrawing Partners and Mr. DeGirolamo were the equity partners at M&F when it dissolved. The Withdrawing Partners, which counted among their ranks every member

of M&F's Executive Committee, carried on most, if not all, of the negotiations with Locke Lord.

19.     The Withdrawing Partners and Mr. DeGirolamo all worked in M&F's New York City office.

<u>**General Factual Allegations**</u>

*Background*

20.     M&F, founded in 1896, was one of the oldest intellectual property law firms in the country.  The firm handled everything from litigation to patent and trademark prosecution.  Its clients included major companies like IBM, Procter & Gamble and Bristol–Meyers Squib.

21.     M&F was a boutique practice, although the firm did have as many as 31 partners in mid-2007.

22.     M&F was always based in New York City and moved downtown in 2004 after receiving a $1,883,000 grant from the New York State Urban Development Corporation d/b/a Empire State Development Corporation ("ESDC").  M&F signed a 20-year lease for the entire 20th and 21st floors of Three World Financial Center.  The landlord was BFP Tower C Co. LLC ("BFP").

23.     M&F's performance under the lease was secured by a $4,910,360 letter of credit issued by JPMorgan.  JPMorgan, in turn, claimed to take a first-priority security interest in substantially all of M&F's assets.

24.     M&F also had a few, much smaller offices in other locations, including the one in San Francisco, California.

*The Partnership Agreement*

25.     The 2007 Partnership Agreement (the "PA") was in effect at all relevant times.

26.     There were three main classes of partners under the PA: "Regular Partners," "Special Partners" and "Retired Partners."  Paragraph No. 7.  A Regular Partner was a "full-time working partner with an ownership interest in [M&F] and the right to vote upon all matters pertaining to, and brought to a vote by [M&F]."  Paragraph No. 7(A).  Upon information and belief, Mr. DeGirolamo and every one of the Withdrawing Partners were Regular Partners.

27.     The PA made clear that cases serviced by Regular Partners belonged to M&F: "All legal services performed by any partner of the Firm shall be for the benefit of the Firm, and all compensation of any kind received for such services shall be the property of the Firm."  Paragraph No. 7(a)(ii).

28.     The Executive Committee, which consisted of seven partners who were elected by their peers to serve two-year terms (Paragraph No. 9(a)(i)), had the authority in "appropriate circumstances" to "reduce, defer or eliminate draws to some or all the Regular Partners" (Paragraph No. 11(b)). The PA generally "charged [the Executive Committee] with the authority and responsibility for management and operations of the partnership."  Paragraph No. 9(a)(i).

29.     As to withdrawing partners, the PA provided that they were "not entitled to share in [M&F]'s accounts receivable or unbilled fees for work in progress."  Paragraph 13(e)(i).  "A withdrawing partner [also] forfeit[ed] his or her Percentage Interest in any deferred or contingent fee that ha[d] not been collected at the Withdrawal Date."  Paragraph No. 13(e)(ii). Likewise, "[a]ll files, records, forms, discs, tapes, software, memoranda, correspondence, and all documents and writings of any kind or nature pertaining to the business or clients of [M&F] [were], as between [M&F] and [a] withdrawing partner, … the sole and exclusive property of the Firm."  Paragraph 13(f).

*Financial Problems*

30.     M&F experienced a series of partner defections in the years leading up to 2007 as larger, general-practice law firms tried to develop intellectual property practices by poaching attorneys from boutique firms.  Upon information and belief, this was the impetus behind the provisions added to the PA in 2007 barring partners who left from sharing in the uncollected, unbilled, deferred or contingent fees for work in progress.

31.     Seven partners left M&F in the summer of 2007, including Chris Hughes who had a very substantial book of business.

32.     The partner defections had a significant and immediate impact on M&F.  The firm's income plummeted in 2008:  it earned $3.2 million the entire year compared to $17.5 million the year before.  What is more, the $3.2 million was virtually all earned in the first six months; M&F made virtually no money in the second half of the year.

33.     Four more partners left in April 2008 and the Executive Committee reduced partner distributions at about the same time.

34.     M&F stopped paying the partners their regular draw in July 2008, laid off lawyers and staff in August 2008 and began exploring other ways to drastically cut costs.

***The Withdrawing Partners Give In To Locke Lord and Disregard the Interests of M&F and Its Creditors***

35.     To deal with their financial crisis the Withdrawing Partners initially tried to wind down M&F responsibly and turned to Locke Lord for a merger, but, under intense pressure from Locke Lord, they ultimately disregarded their fiduciary duty and abandoned the interests of M&F and its creditors.

36.     M&F retained outside counsel in late-October/early-November 2008 and started work on a dissolution plan.  The firm retained Michael Kaminsky of Pollack & Kaminsky on

October 29, 2008 to "represent [M&F] and its successor (if any) in connection with [M&F's] partnership status and future plans." On Mr. Kaminsky's suggestion M&F retained Duane Morris as bankruptcy counsel a short while later.

37.     M&F also began exploring a merger with another firm. Although it met with several firms, Locke Lord expressed the greatest interest and quickly became the sole candidate.

38.     The Withdrawing Partners started knuckling under to Locke Lord early on. For example, upon information and belief, M&F planned to issue a WARN Act notice to its employees in November but held off at Locke Lord's urging. And when the partners wanted to take a draw in December 2008 after not having taken one for several months they cleared it with Locke Lord first.

39.     The Withdrawing Partners also gave Locke Lord permission to talk to BFP directly about the New York office.

40.     Upon information and belief, Locke Lord and M&F engaged in extensive discussions about a merger and worked on a "term sheet" that called for Locke Lord to take an assignment of M&F's New York lease and issue a substitute letter of credit to BFP.

41.     Then, however, Locke Lord abandoned the deal in favor of an approach that might allow it to gain all the benefits of a merger without assuming M&F's debts and obligations. The Withdrawing Partners were not happy about this initially and put up some resistance, but they ultimately acquiesced.

42.     **[REDACTED]**

43.     **[REDACTED]**

44.     **[REDACTED]**

45.                                **[REDACTED]**

46.                                **[REDACTED]**

47.                                **[REDACTED]**

48.                                **[REDACTED]**

49.                                **[REDACTED]**

50.                                **[REDACTED]**

51.                                **[REDACTED]**

52.                                **[REDACTED]**

53.                                **[REDACTED]**

54.                                **[REDACTED]**

55.                                **[REDACTED]**

56.                                **[REDACTED]**

57.                                **[REDACTED]**

58.      M&F paid the January rent to buy more time.

59.                                **[REDACTED]**

60.                                **[REDACTED]**

61.      On January 23, 2009, Locke Lord sent offer letters to all of the remaining M&F

equity partners except maybe Mr. DeGirolamo.  Locke Lord also extended offers to two

contract partners, Matthew Blackburn and James Hwa. The scheduled start date was February 2, 2009.

62. Locke Lord offered prospective equity partners, including Withdrawing Partners William Feiler, Peter Fill, James Gould, Harry Marcus, Steven Meyer and John Sweeney, a target annualized compensation. Mr. Sweeney was slated to receive $1.6 million.

63. Actual compensation, however, would depend on the actual performance of all the M&F partners who got offers. Compensation would be capped until a "Group Factor" was achieved. This Group Factor "w[ould] be achieved when revenues collected in 2009 from [the former M&F partners'] current clients … or from new clients the group attract[ed] to the Firm generat[ed] at least $750,000 in average revenues per lawyer and at least $1,000,000 in average profits per Equity Partner."

64. Locke Lord projected the former M&F partners would generate about $26 million in fees for the first year at Locke Lord according to publicly-filed documents. The vast majority of this would obviously come from cases the partners took from M&F to Locke Lord.

### *M&F Dissolves and Locke Lord Takes Over*

65. A Plan of Dissolution (the "Plan") for M&F was adopted on January 29, 2009 by unanimous votes of the equity partners, including the Withdrawing Partners, who had recently received offers from Locke Lord, and Mr. DeGirolamo.

66. The Plan purported to ensure "that the assets of [M&F] [would be] preserved and protected for the benefit of, first, the creditors of [M&F] as well as all others to whom [M&F] [was] obligated and, thereafter, the Partners and former Partners of [M&F] in accordance with the Partnership Agreement." Section III(A).

67. Yet the Plan also purported to waive M&F's "rights and claims under the doctrine

of <u>Jewel v. Boxer</u>, 56 <u>Cal. App. 3d</u> 171 (1984) or other similar doctrine or case law, to the

extent (if any) applicable to the firm, to seek payment of legal fees generated after the departure

date of any lawyer or group of lawyers with respect to non-contingency/non-success fee matters

only" (the "<u>Jewel</u> Waiver").  Section VII(B).

68.     On January 28, 2009 Locke Lord finally worked out a deal with BFP on the

manufactured termination of M&F's New York lease and settled on a February 1 default.  Paula

Lynch Griffith of Locke Lord explained in a January 28 email to James Gould: "The termination

is intended to arise from a rent default as of Feb. 1.  We had asked [BFP] to date the docs so that

the M&F termination is as of Jan 31 and our new lease is Feb 1.  That causes a problem for

them since technically the rent default hasn't happened yet."

69.     Locke Lord and M&F entered into a Mutual License Agreement on January 31,

2009 that, among other things, allowed Locke Lord to use a portion of the New York office

even before the default and the execution of a new lease.  This agreement acknowledged that

client files were already being transferred to Locke Lord.

70.     Effective that same day Locke Lord took over M&F's San Francisco office after

having signed a new lease.

71.     The Withdrawing Partners and the two contract partners who had received offers

from Locke Lord resigned from M&F on Saturday, January 31, 2009 and began working for

Locke Lord on Monday, February 2.  The name on the doors to the New York Office was

changed from M&F to Locke Lord over that weekend.

72.     Locke Lord extended offers to and hired many other M&F attorneys and staff at

around the same time.  It issued a press release on February 5, 2010 announcing that "more than

30 lawyers previously with New York-based M&F" were joining Locke Lord, including "13

partners and the previous members of [M&F's] Executive Committee." According to the release this "more than doubled the size of Locke Lord's New York office to about 50 attorneys." The new San Francisco office was also mentioned in the release.

73. Upon information and belief, 43 non-lawyers who worked at M&F were hired by Locke Lord.

74. As one of his last acts before leaving M&F, John Sweeney signed a Termination Agreement to effectuate the deal Locke Lord had worked out earlier with BFP to create and time the default on M&F's New York Lease. Through this Termination Agreement the Withdrawing Partners expressly and intentionally set the stage for BFP to draw down on the LOC:

> WHEREAS, [M&F] has failed to pay Rent which was due and payable as of February 1, 2009, and Tenant [M&F] has advised Landlord [BFP] that Tenant will not pay further Rent, that Tenant repudiates the Lease and will not perform material obligations of tenants, and that tenant desires to abandon the premises ….
>
> ***
> Tenant waives all notices of default and all grace periods that would otherwise be applicable to Tenant's default.
>
> ***
> Tenant shall not challenge, object to, or otherwise interfere in any manner, with Landlord's draw under the [LOC], and shall not seek to recover the proceeds of the [LOC] from Landlord or otherwise interfere with Landlord's continued retention of such proceeds.
>
> ***
> [E]ach of Landlord and Tenant hereby fully releases and discharges the other from all liabilities, demands, charges, accounts, claims, rights, and causes of action of any nature, including, without limitation, both known and unknown claims and causes of action, that arose, or will arise, out of, or in connection with the Premises and the Lease ….

75. Mr. Sweeny signed ahead of time because he knew he would leave M&F before

the agreement could be dated and executed by BFP.

76.     The Termination Agreement was later dated February 11, 2009 and counter-signed by BFP.

77.     Locke Lord immediately authorized BFP to release from escrow the signature pages on a new lease it had signed for the exact same space, the entire 20th and 21st floors of Three World Financial Center.  The lease commenced effective as of February 11, 2009.

### *Letter of Credit Drawdown and Assignment*

78.     BFP presented a sight draft to JPMorgan on or about February 3, 2009 seeking to draw down on the $4.9 million Letter of Credit.

79.     JPMorgan honored the sight draft, paid BFP the $4.9 million and sent a default letter to M&F demanding immediate payment of the principal amount, plus interest, costs and fees.

80.     JPMorgan withdrew monies from M&F accounts to pay down part of the obligation.  The balance due at the time JPMorgan filed a proof of claim against the Estate was $3.2 million.

81.     JPMorgan purported to transfer its claims against M&F, and its claimed first priority security interest, to Locke Lord on or about December 2, 2009.

### *The Distributions and Transfers*

82.     From July 1, 2008 to the Petition Date, Debtor (a) made certain payments to or for the benefit of the Withdrawing Partners and Joseph DeGirolamo; (b) transferred interests in the Debtor's property to or for the benefit of the Withdrawing Partners, Locke Lord and/or Mr. DeGirolamo; and (c) incurred obligations for the benefit of the Withdrawing Partners, Locke Lord and/or Mr. DeGirolamo.

83.     The payments during said period were in the form of distributions to or for the benefit of the Withdrawing Partners and Mr. DeGirolamo either as partner compensation or return of capital (collectively, the "Distributions").  The Distributions are detailed in the attached Exhibit A.

84.     During said period Debtor transferred interests in its property or incurred obligations when it, among other things, (a) entered into the lease Termination Agreement and accompanying release, which paved the way for the drawdown on the LOC; (b) adopted the purported <u>Jewel</u> waiver; and (c) agreed to the transfer of profits from the Unfinished Business of M&F to or for the benefit of Locke Lord and the Withdrawing Partners.  These transfers or incurred obligations will be referred to collectively as the "Transfers."

**First Claim for Relief**
**Accounting (11 U.S.C. §542) - Locke Lord, Withdrawing Partners**

85.     Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

86.     Bankruptcy Code Section 542 requires Locke Lord and each of the Withdrawing Partners to deliver to Plaintiff, and account for, all "property that the trustee may use."

87.     The Withdrawing Partners and others took with them to Locke Lord virtually all of M&F's active cases, including contingency cases that may have been technically closed at the time but were still generating fees.

88.     Locke Lord has produced spreadsheets of hundreds of cases it inherited from M&F and the substantial fees billed on the matters through December 31, 2010.  Because Locke Lord designated these spreadsheets "Confidential" pursuant to an agreement with Plaintiff, they are incorporated here by reference.

89.     Upon information and belief, this Unfinished Business has yielded profits for

Locke Lord, and the cases that were not closed as of December 31, 2010 have generated or will continue to generate additional fees that have yielded or will continue to yield additional profits. All the past, current and future net profits from the Unfinished Business should be delivered to Plaintiff under Section 542 of the Bankruptcy Code or held in trust for M&F pursuant to NYPL §§40, 43.

90.     The Withdrawing Partners entered into agreements with Locke Lord that entitled them to a share of the profits from the Unfinished Business as part of their compensation.  They have shared in the Unfinished Business profits already earned and will share in the future profits.

91.     The <u>Jewel</u> Waiver in the Plan is unenforceable or voidable, to the extent it even applies (i.e., it does not cover contingency/success-fee cases).

92.     The amount of the profits on the Unfinished Business is unknown to Plaintiff and cannot be ascertained without a full accounting from Locke Lord or the Withdrawing Partners.

93.     Locke Lord and the Withdrawing Partners have information and documents that will shed light on the profits from the Unfinished Business.

94.     Plaintiff is entitled to an order pursuant to Section 542 of the Bankruptcy Code compelling Locke Lord and the Withdrawing Partners to produce an accounting of the profits from the Unfinished Business of M&F, along with such other and further relief as the Court may deem just and proper.

**<u>Second Claim for Relief</u>**
**Accounting (NYPL §43) - Withdrawing Partners**

95.     Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

96.     The Withdrawing Partners are subject to NYPL §43(1), which provides, "Every

partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property."

97.     Plaintiff is entitled to an order pursuant to NYPL §43(1) compelling each Withdrawing Partner to produce an accounting of the profits from the cases he or she took to Locke Lord and his or her share of those profits, along with such other and further relief as the Court may deem just and proper.

**Third Claim for Relief**
**Turnover of Profits from the Unfinished Business - Locke Lord, Withdrawing Partners**

98.     Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

99.     The Withdrawing Partners have an obligation under NYPL §43 to account for the profits from the Unfinished Business and hold them in trust for M&F's Estate. Also, "[n]o [Withdrawing Partner] is entitled to remuneration for acting in the partnership business, except that a surviving partner is entitled to reasonable compensation for his services in winding up the partnership affairs." NYPL §40(6).

100.     The net profits from the Unfinished Business, including the Withdrawing Partners' shares, are property of M&F's Estate. The compensation formula in Locke Lord's offer letters to the Withdrawing Partners projected that the profits from the Unfinished Business would be substantial.

101.     The eleventh hour attempt to extinguish certain of M&F's rights to the profits from the Unfinished Business by inserting the Jewel Waiver in the Plan is unenforceable and avoidable.

102.    Plaintiff is entitled to an order pursuant to Sections 541 and 542 of the Bankruptcy Code compelling Locke Lord and the Withdrawing Partners to turn over to the Estate the net profits from the Unfinished Business of M&F, plus prejudgment interest, attorneys' fees, expenses and costs and such other and further relief as the Court may deem just and proper.

### Fourth Claim for Relief
### Unjust Enrichment - Locke Lord, Withdrawing Partners

103.    Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

104.    Upon information and belief, Locke Lord and the Withdrawing Partners have received and will continue to receive net profits from the Unfinished Business of M&F -- benefits that belong to the Estate.

105.    It is unconscionable, inequitable and unjust for Locke Lord and the Withdrawing Partners to be enriched by and to keep these benefits.

106.    Equity and good conscience require restitution.  Locke Lord and the Withdrawing Partners must return the improperly retained benefits to the Estate.

107.    Plaintiff is entitled to a judgment against Locke Lord and the Withdrawing Partners in the amount of the net profits from the Unfinished Business of M&F, plus prejudgment interest, attorneys' fees, expenses and costs and such other and further relief as the Court may deem just and proper.

### Fifth Claim for Relief
### Money Had and Received - Locke Lord, Withdrawing Partners

108.    Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

109.    The Withdrawing Partners and Locke Lord have received and will continue to

receive net profits from Unfinished Business that belong to the Estate, and they have benefited and will continue to benefit from those net profits.

110.    The Withdrawing Partners and Locke Lord should not be allowed to retain the net profits under principles of good conscience.

111.    Plaintiff is entitled to a judgment against Locke Lord and the Withdrawing Partners in the amount of the net profits from the Unfinished Business of M&F, plus prejudgment interest, attorneys' fees, expenses and costs and such other and further relief as the Court may deem just and proper.

### Sixth Claim for Relief
### Constructive Trust - Withdrawing Partner, Locke Lord

112.    Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

113.    Partners are accountable as fiduciaries under NYPL §43.  They also owe a duty of loyalty and care to their firm and the firm's creditors.

114.    The Withdrawing Partners, who counted among their group all the members of the Executive Committee, owed M&F a duty of loyalty and care, and owed M&F's creditors a fiduciary duty to preserve the firm's assets.

115.    The Withdrawing Partners breached their fiduciary duty when they, among other things, purported to transfer or promise the profits from the Unfinished Business to themselves and Locke Lord.

116.    In reliance on that promise or transfer the Withdrawing Partners and Locke Lord have taken and will continue to take net profits from the Unfinished Business.

117.    The Withdrawing Partners and Locke Lord have been unjustly enriched.

118.    Plaintiff has no adequate remedy at law.

119.     Plaintiff is entitled to an order imposing a constructive trust for the benefit of the Estate over the net profits from the Unfinished Business of M&F, along with such other and further relief as the Court may deem just and proper.

**<u>Seventh Claim for Relief</u>**
**Successor Liability/*de facto* Merger - Locke Lord**

120.     Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

121.      The Withdrawing Partners started looking to merge M&F with another firm in the latter half of 2008 in an effort to deal with M&F's dire financial circumstances.

122.     Locke Lord quickly became the only serious suitor, and after extensive discussions submitted a term sheet to M&F outlining a full-fledged merger, including Locke Lord's assumption of M&F's New York lease.  Locke Lord later backed off from a deal labeled a "merger" because it wanted all the benefits of taking over M&F without the accompanying liability for M&F's debts and obligations.

123.     Locke Lord elected instead to make offers to the Withdrawing Partners and many of M&F's other attorneys and staff and to negotiate directly with BFP and the California landlord to take over M&F's New York and San Francisco offices.

124.     Locke Lord did not call this a merger, but that is in fact what it was.  Locke Lord retained all the M&F partners except one, including the Withdrawing Partners and every member of M&F's Executive Committee; it also hired many other M&F employees, including over 20 attorneys and over 40 staff.  The partners brought their cases over to Locke Lord -- their clients became Locke Lord clients.  Locke Lord negotiated leases for the exact same spaces occupied by M&F; so, upon information and belief, the Withdrawing Partners and the other M&F attorneys and employees it hired stayed in their same offices or work stations.  Upon

information and belief, Locke Lord kept and used much of the same furniture, office equipment and artwork. Apart from adding some of its own people and changing the name on the door, Locke Lord kept the essential operation intact.

125. There was substantial continuity of M&F's operation when Locke Lord took over.

126. Having merged with M&F in fact Locke Lord is now responsible for all M&F's liabilities and obligations, including the claims of M&F's creditors.

127. Plaintiff has no adequate remedy at law.

128. Plaintiff is entitled to a judgment declaring that Locke Lord is M&F's successor and is liable for all of M&F's debts and obligations, along with such other and further relief as the Court may deem just and proper.

### Eighth Claim for Relief
**Avoidance and Recovery of Preferential Transfers (11 U.S.C. §§547(b), 550(a) and 551) - Withdrawing Partners, Joseph DeGirolamo**

129. Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

130. The Withdrawing Partners and Mr. DeGirolamo were "insiders" as that term is used in Section 547(b)(4)(B) of the Bankruptcy Code.

131. The Distributions, or parts thereof, were to or for the benefit of the Withdrawing Partners and Mr. DeGirolamo as compensation as partners when they were insiders and within one year prior to the Petition Date.

132. Debtor made each distribution for, or on account of, an antecedent debt, namely, upon information and belief, compensation as partners.

133. Debtor is presumed to have been, and was in fact, insolvent at the time of the distributions on or within 90 days before the Petition Date. Bankruptcy Code Section 547(f).

134. Debtor was also insolvent at the time of the earlier distributions.

135. Each distribution enabled the partner to receive more than he or she would have received had (a) the distribution not been made and (b) he or she received payment to the extent provided in the bankruptcy.

136. The Distributions depleted the assets of the Estate.

137. The Distributions are accordingly avoidable as preferential transfers under section 547(b) of the Bankruptcy Code.

138. Plaintiff is entitled to the entry of an order pursuant to Sections 547(b), 550(a) and 551 of the Bankruptcy Code (a) avoiding and preserving the Distributions; (b) directing that the Distributions be set aside; (c) recovering the Distributions, or their value, for the benefit of the Estate; and (d) such other and further relief as the Court may deem just and proper.

**Ninth Claim for Relief**
**Avoidance and Recovery of Constructive Fraudulent Transfers (11 U.S.C. §§548(a)(1)(B), 550(a) and 551) - Locke Lord, Withdrawing Partners, Joseph DeGirolamo**

139. Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

140. The Transfers were to or for the benefit of Locke Lord, the Withdrawing Partners and/or Mr. DeGirolamo.

141. The Transfers were made within two years before the Petition Date.

142. Debtor received less than reasonably equivalent value in exchange for the Transfers. Neither Locke Lord nor the Withdrawing Partners nor Joseph DeGirolamo gave anything of value to M&F in exchange for the Transfers.

143. At the time of each transfer, Debtor (i) was insolvent, or rendered insolvent by the transfer; (ii) was engaged in business or a transaction, or was about to engage in business or a

transaction, for which any property remaining with it was an unreasonably small capital; (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured; or (iv) made the transfer for the benefit of an insider under an employment contract and not in the ordinary course of business.

144. Plaintiff is entitled to the entry of an order pursuant to Sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; (c) recovering the Transfers, or their value, for the benefit of the Estate; and (d) such other and further relief as the Court may deem just and proper.

**Tenth Claim for Relief**
**Avoidance and Recovery of Intentional Fraudulent Transfers (11 U.S.C. §§548(a)(1)(A), 550(a) and 551) - Locke Lord, Withdrawing Partners**

145. Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

146. The Transfers were to or for the benefit of Locke Lord and the Withdrawing Partners with the actual intent to hinder or delay creditors, as evidenced by, among other things: (a) the close relationship and mutual interests of Locke Lord and the Withdrawing Partners as prospective business partners; (b) the manufactured default of the New York Lease, and the post-dated Termination Agreement; (c) the acknowledgment by Locke Lord and the Withdrawing Partners that their actions paved the way for a drawdown on the LOC; (d) the last-minute Jewel Waiver; (e) the complete lack of consideration for the Transfers; (f) M&F's dire financial condition at the time of the Transfers; (g) the Withdrawing Partners' failure to explore other options once Locke Lord pulled the plug on a merger; and (h) the retention by the Withdrawing Partners of an interest in the profits from the Unfinished Business that they were transferring to Locke Lord.

147.    Plaintiff is entitled to the entry of an order pursuant to Sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; (c) recovering the Transfers, or their value, for the benefit of the Estate; (d) attorneys' fees; and (e) such other and further relief as the Court may deem just and proper.

**Eleventh Claim for Relief**
**Avoidance and Recovery of Constructive Fraudulent Conveyances (NYDCL §§271-75 and 278 or 279; 11 U.S.C. §§544(b), 550(a) and 551) - Locke Lord, Withdrawing Partners, Joseph DeGirolamo**

148.    Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

149.    The Distributions and Transfers were conveyances under the New York Debtor and Creditor Law.

150.    The Debtor did not receive fair consideration for the Distributions or Transfers within the meaning of NYDCL §272.

151.    At the time of each transfer, Debtor (i) was insolvent, or was rendered insolvent by the distribution or transfer; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with it was an unreasonably small capital; or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

152.    At all times relevant to the Distributions and Transfers, there have been and are one or more creditors who have held and still hold matured and unmatured unsecured claims against M&F that were and are allowable under Section 502 of the Bankruptcy Code or that were and are not allowable under Section 502(e) of the Bankruptcy Code.

153.    Plaintiff is entitled to the entry of an order pursuant to Sections 544(b), 550(a) and

551 of the Bankruptcy Code and NYDCL §§271-275 and 278 or 279 (a) avoiding and preserving the Distributions and Transfers; (b) directing that the Distributions and Transfers be set aside; (c) recovering the Distributions and Transfers, or their value, for the benefit of the Estate; and (d) such other and further relief as the Court may deem just and proper.

### Twelfth Claim for Relief
**Avoidance and Recovery of Intentional Fraudulent Conveyances (NYDCL §§276, 276-a and 278 or 279; 11 U.S.C. §§544(b), 550(a) and 551) - Locke Lord, Withdrawing Partners**

154.    Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

155.    The Transfers were made to or for the benefit of Locke Lord and the Withdrawing Partners with the actual intent of the transferor and transferee to hinder or delay creditors as set forth in this Complaint.

156.    Plaintiff is entitled to the entry of an order pursuant to Sections 544(b), 550(a) and 551 of the Bankruptcy Code and NYDCL §§276, 276-a and 278 or 279 (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; (c) recovering the Transfers, or their value, for the benefit of the Estate; (d) attorneys' fees pursuant to NYDCL §276-a; and (e) such other and further relief as the Court may deem just and proper.

### Thirteenth Claim for Relief
**Avoidance and Recovery of Fraudulent Conveyances to Partners (11 U.S.C. §§544(b), 550(a) and 551; NYDCL §§277 and 278 or 79) - Locke Lord, Withdrawing Partners, Joseph DeGirolamo**

157.    Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

158.    The Distributions and Transfers were conveyances under the New York Debtor and Creditor Law.

159.    At the time of each distribution or transfer, Debtor was insolvent, or was rendered

insolvent by the distribution or transfer, and the distribution or transfer was to a partner.

160.    At all times relevant to the Distributions and Transfers, there have been and are one or more creditors who have held and still hold matured and unmatured unsecured claims against M&F that were and are allowable under Section 502 of the Bankruptcy Code or that were and are not allowable under section 502(e) of the Bankruptcy Code.

161.    Plaintiff is entitled to the entry of an order pursuant to Sections 544(b), 550(a) and 551 of the Bankruptcy Code and NYDCL §§277 and 278 or 279 (a) avoiding and preserving the Distributions and Transfers; (b) directing that the Distributions and Transfers be set aside; (c) recovering the Distributions and Transfers, or their value, for the benefit of the Estate; and (d) such other and further relief as the Court may deem just and proper.

**Fourteenth Claim for Relief**
**Disallowance (11 U.S.C. §502(d)) - Locke Lord**

162.    Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

163.    JPMorgan transferred its bankruptcy claim against the Estate to Locke Lord.

164.    As set forth in this Complaint, the Transfers were made to or for the benefit of Locke Lord.  The Transfers are avoidable and recoverable under Sections 548(a)(1)(A), (B), 550(a) and 551 of the Bankruptcy Code, and Locke Lord has not returned the value of the Transfers to Debtor.

165.    Plaintiff is entitled to an order pursuant to Section 502(d) of the Bankruptcy Code disallowing the bankruptcy claim JPMorgan transferred to Locke Lord unless and until such time as Locke Lord turns over to Plaintiff the value of the Transfers, plus interest and costs.

## Fifteenth Claim for Relief
### Breach of Fiduciary Duty - Withdrawing Partners

166.    Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

167.    The Withdrawing Partners owed M&F and its creditors a statutory and fiduciary duty of loyalty and care.

168.    The Withdrawing Partners breached their fiduciary duty through the Distributions, Transfers and the other actions described above, all of which violated their duty of loyalty and care.

169.    The Withdrawing Partners negotiated with Locke Lord at first but ultimately were so intent on consummating a transaction in any form with Locke Lord that they ignored their fiduciary responsibilities.  In addition to the above, for example, the Withdrawing Partners should have explored whether anyone besides Locke Lord was interested in taking an assignment of M&F's lease.  Upon information and belief, the Withdrawing Partners did little, if anything, in that regard.  They also failed to account for the ESDC grant in their negotiations with Locke Lord and thus gave ESDC an opening to file a $919,800 recapture claim against the Estate for M&F's failure to meet certain employment goals.  Various former M&F employees have filed WARN Act claims against the Estate.  To the extent these claims have any merit, the Withdrawing Partners breached their fiduciary duty to ensure M&F did not violate the Act.

170.    The Withdrawing Partners did Locke Lord's bidding and breached their duty of loyalty and care to M&F and its creditors for an obvious reason: they knew it would benefit them personally once they withdrew from M&F and joined the successor firm.  They knew Locke Lord was asking them to take actions that were contrary to the interests of M&F and its creditors, but complied in any event.

171.     The Withdrawing Partners went to great lengths to please Locke Lord.   Mr. Sweeney went so far as to sign the lease Termination Agreement at a time when he knew it would have to be post-dated because it was premised on a staged default in the future.  And he and the other Withdrawing Partners knew that this would give BFP everything it needed to draw down on the LOC.

172.     M&F and its creditors have been harmed by the Withdrawing Partners' actions. The Withdrawing Partners, among other things, (a) saddled the Estate with substantial claims from the LOC drawdown and from the recapture on the ESDC grant; (b) withheld from the Estate the profits from the Unfinished Business of M&F; and (c) depleted the assets of the Estate through preferential and fraudulent transfers.

173.     Plaintiff is entitled to a judgment against the Withdrawing Partners for their breach of fiduciary duty in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses and costs and such other and further relief as the Court may deem just and proper.

### Sixteenth Claim for Relief
### Aiding and Abetting - Locke Lord, Withdrawing Partners

174.     Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

175.     The Withdrawing Partners knew that they were breaching their fiduciary duty and gave substantial assistance to each other in making the important decisions and carrying out the actions discussed above.  They also knowingly induced each other to engage in the Distributions, Transfers and other actions discussed above (collectively, the "Tortious Acts"), and were each knowing participants in the Tortious Acts.

176.     Locke Lord knew about the Tortious Acts, and gave substantial assistance to the

Withdrawing Partners on the Tortious Acts. It also knowingly induced the Withdrawing Partners to engage in the Tortious Acts, and was a knowing participant in some or all of the Tortious Acts.

177. Locke Lord was a primary player in many ways. Most notably, the manufactured default on M&F's New York lease, which led to the LOC drawdown, was negotiated by Locke Lord directly with BFP.

178. M&F and its creditors have been harmed by the Tortious Acts.

179. Plaintiff is entitled to a judgment against each Withdrawing Partner and Locke Lord for their actions in aiding and abetting the Tortious Acts in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses and costs and such other and further relief as the Court may deem just and proper.

**Seventeenth Claim for Relief**
**Civil Conspiracy - Locke Lord, Withdrawing Partners**

180. Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

181. There were actionable torts here: the Withdrawing Partners breached their fiduciary duty to M&F and its creditors, and each Withdrawing Partner and Locke Lord aided and abetted the Tortious Acts.

182. Locke Lord and each Withdrawing Partner agreed on a plan to disregard the interests of M&F and its creditors and create for themselves a successor operation without M&F's liabilities and with better lease terms. The email communications between Withdrawing Partners and Locke Lord amply demonstrate a coordinated effort toward these ends.

183. The Tortious Acts were an integral part of the plan and advanced its purpose.

184. In addition to the actions discussed above, independent acts in support of the plan

included, among other things, Locke Lord's offers to the Withdrawing Partners and the other M&F employees; the acceptance of the offers by the Withdrawing Partners; the negotiations with BFP on the new lease for the New York office; and the cooperation between Locke Lord and the Withdrawing Partners in setting up the new office.

185.    Upon information and belief, Locke Lord and each Withdrawing Partner knew about the plan and the Tortious Acts and intentionally participated in both.

186.    M&F and its creditors have been harmed by the conspiracy.

187.    Plaintiff is entitled to a judgment against each Withdrawing Partner and Locke Lord for their conspiracy against M&F in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses and costs and such other and further relief as the Court may deem just and proper.

**Eighteenth Claim for Relief**
**Disallowance on Equitable Grounds - Locke Lord**

188.    Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

189.    The bankruptcy claim that JPMorgan transferred to Locke Lord is based on the LOC drawdown.

190.    The drawdown, in turn, was made possible and assured by Locke Lord's actions in manipulating events and manufacturing a default on M&F's lease.

191.    The drawdown has depleted the assets available to the Estate.

192.    It is unjust and inequitable to allow Locke Lord to recover on a claim that emanates from its own inequitable conduct.

193.    Plaintiff has no adequate remedy at law.

194.     Plaintiff is entitled to an order disallowing the bankruptcy claim JPMorgan

transferred to Locke Lord, along with such other and further relief as the Court may deem just and proper.

**Nineteenth Claim for Relief**
**Equitable Subordination (11 U.S.C. §510) - Locke Lord**

195.    Plaintiff repeats and alleges again the allegations in each preceding paragraph of the Complaint.

196.    In the alternative, equity demands that the bankruptcy claim JPMorgan transferred to Locke Lord be subordinated to all other claims against the Estate, or that any lien securing the claim be transferred to the Estate.

197.    Equitable subordination under the circumstances would be consistent with the bankruptcy laws.

198.    Plaintiff is entitled to the entry of an order pursuant to Section 510 of the Bankruptcy Code subordinating the bankruptcy claim JPMorgan transferred to Locke Lord or transferring any lien securing the claim to the Estate, along with such other and further relief as the Court may deem just and proper.

**RESERVATION OF RIGHTS**

Plaintiff reserves the right to bring any and all other causes of action that it may maintain against Defendants, including, without limitation, causes of action arising out of the same transactions described in the Complaint to the extent discovery in this action or further investigation by Plaintiff reveals such further causes of action.  Plaintiff specifically reserves the right to amend this Complaint to seek to avoid any additional transfers that may be revealed in the course of discovery or further investigation.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

a. On the First Claim for Relief, an order pursuant to Section 542 of the Bankruptcy Code compelling Locke Lord and the Withdrawing Partners to produce an accounting of the profits from the Unfinished Business of M&F.

b. On the Second Claim for Relief, an order pursuant to NYPL §43(1) compelling each Withdrawing Partner to produce an accounting of the profits from the cases he or she took to Locke Lord and his or her share of those profits.

c. On the Third Claim for Relief, an order pursuant to Sections 541 and 542 of the Bankruptcy Code compelling Locke Lord and the Withdrawing Partners to turn over to the Estate the net profits from the Unfinished Business of M&F.

d. On the Fourth and Fifth and Claims for Relief, a judgment against Locke Lord and the Withdrawing Partners in the amount of the net profits from the Unfinished Business of M&F.

e. On the Sixth Claim for Relief, an order imposing a constructive trust for the benefit of the Estate over the net profits from the Unfinished Business of M&F.

f. On the Seventh Claim for Relief, a judgment declaring that Locke Lord is M&F's successor and is liable for all of M&F's debts and obligations.

g. On the Eighth Claim for Relief, an order pursuant to Sections 547(b), 550(a) and 551 of the Bankruptcy Code (a) avoiding and preserving the Distributions; (b) directing that the Distributions be set aside; and (c) recovering the Distributions, or their value, for the benefit of the Estate.

h. On the Ninth Claim for Relief, an order pursuant to Sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; and (c) recovering the Transfers, or their value, for the benefit of the Estate.

i. On the Tenth Claim for Relief, an order pursuant to Sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; and (c) recovering the Transfers, or their value, for the benefit of the Estate.

j. On the Eleventh Claim for relief, an order pursuant to Sections 544(b), 550(a) and 551 of the Bankruptcy Code and NYDCL §§271-275 and 278 or 279 (a) avoiding and preserving the Distributions and Transfers; (b) directing that the Distributions and Transfers be set aside; and (c) recovering the Distributions and Transfers, or their value, for the benefit of the Estate.

k. On the Twelfth Claim for Relief, an order pursuant to Sections 544(b), 550(a) and 551 of the Bankruptcy Code and NYDCL §§276, 276-a and 278 or 279 (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; (c) recovering the Transfers, or their value, for the benefit of the Estate; and (d) attorneys' fees pursuant to NYDCL §276-a.

l. On the Thirteenth Claim for Relief, an order pursuant to Sections 544(b), 550(a) and 551 of the Bankruptcy Code and NYDCL §§277 and 278 or 279 (a) avoiding and preserving the Distributions and Transfers; (b) directing that the Distributions and Transfers be set aside; and (c) recovering the Distributions and Transfers, or their value, for the benefit of the Estate.

m. On the Fourteenth Claim for Relief, an order pursuant to Section 502(d) of the Bankruptcy Code disallowing the bankruptcy claim JPMorgan transferred to Locke Lord unless and until such time as Locke Lord turns over to Plaintiff the value of the Transfers, plus interest and costs.

n. On the Fifteenth Claim for Relief, a judgment against the Withdrawing Partners for their breach of fiduciary duty in an amount to be determined at trial;

o. On the Sixteenth Claim for Relief, a judgment against each Withdrawing Partner and Locke Lord for their actions in aiding and abetting the Tortious Acts in an amount to be

determined at trial.

p.   On the Seventeenth Claim for Relief, a judgment against each Withdrawing Partner and Locke Lord for their conspiracy against M&F in an amount to be determined at trial;

q.   On the Eighteenth Claim for Relief, an order disallowing the bankruptcy claim JPMorgan transferred to Locke Lord.

r.   On the Nineteenth Claim for Relief, an order pursuant to Section 510 of the Bankruptcy Code subordinating the bankruptcy claim JPMorgan transferred to Locke Lord or transferring any lien securing the claim to the Estate.

s.   Awarding Plaintiff pre-judgment interest.

t.   Awarding Plaintiff reasonable attorneys' fees, expenses and costs.

u.   Granting such other and further relief as the Court deems appropriate and just under the circumstances.

Dated: New York, New York
       March 16, 2011

                              WINDELS MARX LANE & MITTENDORF, LLP
                              *Successor Attorneys for Plaintiff*


                    By:    /s/ Alan Nisselson
                              Alan Nisselson (anisselson@windelsmarx.com)
                              Howard L. Simon (hsimon@windelsmarx.com)
                              156 West 56th Street
                              New York, New York 10019
                              (212) 237-1000